Gallaher v. Ciszek, 2022 NCBC 67.

STATE OF NORTH CAROLINA

CUMBERLAND COUNTY

KEITH JAMES GALLAHER, HUGH
SCOTT CAMERON, II, AND
KRISTEN B. COGGIN,

              Plaintiffs,

v.

THOMAS ARTHUR CISZEK and
CAPE FEAR NEONATOLOGY
SERVICES, P.A., a North Carolina
Professional Association,

              Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
19 CVS 5780

**ORDER AND OPINION ON
PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT AND
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

**AND**

**FINAL JUDGMENT**

1.    **THIS MATTER** is before the Court upon Plaintiffs Keith James Gallaher ("Gallaher"), Hugh Scott Cameron, II ("Cameron"), and Kristen B. Coggin's ("Coggin") (each a "Plaintiff" and, collectively, the "Plaintiffs") Partial Motion for Summary Judgment ("Plaintiffs' Motion"), (ECF No. 69), and Defendants Thomas Arthur Ciszek ("Ciszek") and Cape Fear Neonatology Services, P.A.'s ("Cape Fear Neo" or the "Practice") (together, "Defendants") Motion for Summary Judgment ("Defendants' Motion"), (ECF No. 73), (together with Plaintiffs' Motion, the "Motions") in the above-captioned case.

2.    After considering the parties' briefs in support of and in opposition to the Motions, the appropriate evidence of record, and the arguments of counsel at the hearing held on the Motions, the Court hereby **GRANTS** each Motion **in part, DENIES** each Motion **in part**, and **ENTERS FINAL JUDGMENT** against Defendants as provided herein.

*Player McLean, LLP, by James A. McLean, III and Lonnie M. Player, Jr., for Plaintiffs Keith James Gallaher, Hugh Scott Cameron, II, and Kristen B. Coggin.*

*Hutchens Law Firm, by H. Terry Hutchens and Natasha M. Barone, for Defendants Thomas Arthur Ciszek and Cape Fear Neonatology Services, P.A., a North Carolina Professional Association.*

Bledsoe, Chief Judge.

I.

FACTUAL AND PROCEDURAL BACKGROUND

A.   Factual Background

3.   While findings of fact are not necessary or proper on a motion for summary judgment, "it is helpful to the parties and the courts for the trial judge to articulate a summary of the material facts which he considers are not at issue and which justify entry of judgment." *Collier v. Collier*, 204 N.C. App. 160, 161–62 (2010) (citation and quotation marks omitted).   Therefore, the Court limits its factual recitation to the undisputed material facts necessary to decide the Motions and not to resolve issues of material fact.

4.   Cape Fear Neo was established in 1985 by Ciszek, a neonatologist, and provided neonatology services to Cumberland County Hospital System, Inc. ("CCHS"), which owns and operates Cape Fear Valley Medical Center ("CFVMC") (together, the "Hospital").[1]   Cape Fear Neo staffed the Hospital's Neonatology

---

[1] (Pls.' Mot. Partial Summ. J. Ex. 1, ECF No. 69.2; Pls.' Mot. Partial Summ. J. Ex. 62 Dep. Thomas Ciszek, dated Nov. 9, 2021, at 9:4–8 [hereinafter "Ciszek Dep."], ECF No. 69.63; Pls.' Mot. Partial Summ. J. Ex. 2 Independent Contractor Agreement 1 [hereinafter "Hosp. Agreement"], ECF No. 69.3.)   For ease of reference, Ciszek's deposition also appears on the Court's electronic docket as Exhibit 21 to the Index of Materials in Support of Defendants'

Intensive Care Unit ("NICU") in Fayetteville, North Carolina, from 1 January 1986 through 30 April 2019, pursuant to an Independent Contractor Agreement with the Hospital (the "Hospital Agreement").[2]   At all relevant times, payments made pursuant to the Hospital Agreement were Cape Fear Neo's "only source of revenue."[3]

5.      Gallaher executed an employment contract with Cape Fear Neo on 1 February 1990 (the "Gallaher Contract" or "Gallaher's Contract").[4]   Gallaher's Contract set his salary and provided for a bonus, calculated as a percentage of the bonuses paid to the other two doctors then at Cape Fear Neo.[5]  Gallaher's Contract also contained a non-competition clause and renewed automatically at one-year intervals unless either side submitted a notice of termination, which could be with or without cause.[6]  Though not accounted for in his original employment contract, Cape Fear Neo also began paying into a profit-sharing plan on Gallaher's behalf.[7]   In

Brief in Support of Defendants' Motion for Summary Judgment ("Defendants' Index of Materials") at ECF No. 75.

[2] (Hosp. Agreement 1; Ciszek Dep. 64:19–24.)

[3] (Ciszek Dep. 79:16–18.)

[4] (Pls.' Mot. Partial Summ. J. Ex. 5 Employment Contract 1 [hereinafter "Gallaher Emp. Cont."], ECF No. 69.6.)  For ease of reference, Gallaher's Contract also appears on the Court's electronic docket as Exhibit 1 to Defendants' Index of Materials.

[5] (Gallaher Emp. Cont. ¶ 10.)  While the bonus formula was later amended, (*see* Pls.' Mot. Partial Summ. J. Ex. 7 First Amendment to Employment Contract [hereinafter "Gallaher Am. Emp. Cont."], ECF No. 69.8), the original contract provided for a bonus calculated as 11.11% of any bonus paid to Ciszek, (*see* Gallaher Emp. Cont. ¶ 10(b)).

[6] (Gallaher Emp. Cont. ¶¶ 21, 23.)

[7] (Pls.' Mot. Partial Summ. J. Ex. 66 Aff. Keith James Gallaher, MD, dated Feb. 17, 2022, at ¶ 10 [hereinafter "Gallaher Aff."], ECF No. 69.67.)

January 1991, Cape Fear Neo amended Gallaher's Contract to provide for a bonus equal to the bonuses paid to each of the other doctors at the Practice.[8] Lastly, and not accounted for in either the original contract or the later amendment, Gallaher's salary steadily increased over the years.[9]

6. Cameron joined Cape Fear Neo in July 2005 and executed an employment contract with the Practice on 23 February 2006 (the "Cameron Contract" or "Cameron's Contract").[10] Cameron's Contract included provisions similar to those of Gallaher's Contract: a one year, automatically renewing term of employment; a 90-day notice period for termination without cause; a non-competition agreement; and other covenants pledging to use his utmost knowledge and skill in his employer's and patients' best interests.[11] Cameron's Contract also provided for his participation in Cape Fear Neo's profit-sharing plan.[12]

---

[8] (Pls.' Mot. Partial Summ. J. Ex. 63 Dep. Keith James Gallaher, M.D., dated Nov. 22, 2021, at 51:17–53:14 [hereinafter "Gallaher Dep."], ECF No. 69.64.) For ease of reference, Gallaher's deposition also appears on the Court's electronic docket as Exhibit 17 to Defendants' Index of Materials.

[9] (Pls.' Mot. Partial Summ. J. Ex. 12 [hereinafter "Salary and Bonus Chart"], ECF No. 69.13.)

[10] (Pls.' Mot. Partial Summ. J. Ex. 64 Dep. Hugh Scott Cameron, II, M.D., dated Nov. 22, 2021, at 14:4–11, 47:8–48:12 [hereinafter "Cameron Dep."], ECF No. 69.65.) For ease of reference, Cameron's deposition also appears on the Court's electronic docket as Exhibit 19 to Defendants' Index of Materials.

[11] (*See* Pls.' Mot. Partial Summ. J. Ex. 8 Employment Contract ¶¶ 1, 3, 24, 26 [hereinafter "Cameron Emp. Cont."], ECF No. 69.9.) For ease of reference, Cameron's Contract also appears on the Court's electronic docket as Exhibit 3 to Defendants' Index of Materials.

[12] (Cameron Emp. Cont. ¶¶ 10, 17.)

7.     Like Gallaher's, Cameron's compensation varied from the terms set out in his contract within his first year of employment.[13]  Ciszek was not active in the practice for part of 2006,[14] and his absence increased Cameron's workload.  As a result, Cameron's compensation steadily increased, and he received a greater share of the communal "bonus pool."[15]

8.     Coggin joined Cape Fear Neo in 2012.[16]  Her employment contract also provided for an automatically renewing one-year term, a 90-day without cause termination clause, a covenant not to compete, pledges to use her knowledge and skill in Cape Fear Neo's and her patients' best interests, participation in Cape Fear Neo's profit-sharing plan, compensation in the form of an annual salary, and bonus eligibility beginning in the second year of employment and based on a specified percentage of the common "bonus pool."[17]

---

[13] (Cameron Dep. 22:15–23:13; Pls.' Mot. Partial Summ. J. Ex. 67 Aff. Hugh Scott Cameron, II, MD, dated Feb. 17, 2022, at ¶¶ 11, 13 [hereinafter "Cameron Aff."], ECF No. 69.68.)

[14] (Ciszek Dep. 100:22–01:10; Cameron Dep. 22:15–20.)

[15] (Cameron Dep. 22:15–23:10; Cameron Aff. ¶¶ 12–13.)  Plaintiffs' employment contracts do not expressly provide for payments from a "bonus pool."  The contracts instead use that term as short-hand for the total compensation actually paid to certain named practitioners in excess of their collective standard salaries.  (*See* Pls.' Mot. Partial Summ. J. Ex. 11 Employment Contract ¶ 10(b) [hereinafter "Coggin Emp. Cont."], ECF No. 69.12; Cameron Emp. Cont. ¶ 10(b).)  For ease of reference, Coggin's 1 August 2012 Employment Contract (the "Coggin Contract" or "Coggin's Contract") also appears on the Court's electronic docket as Exhibit 4 to Defendants' Index of Materials.

[16] (Pls.' Mot. Partial Summ. J. Ex. 68 Aff. Kristen B. Coggin, MD, dated Feb. 18, 2022, at ¶ 7 [hereinafter "Coggin Aff."], ECF No. 69.69.)

[17] (*See* Coggin Emp. Cont. ¶¶ 1, 3, 10, 17, 24, 26.)

9. Each Plaintiff's employment contract provided a method for calculating bonuses. Gallaher's bonus was equal to the amount paid to Ciszek, while Coggin's and Cameron's bonuses were calculated as a fraction of the total bonuses paid to the other practitioners, and would increase over time.[18] However, the bonuses in practice soon deviated from the prescribed procedure. In practice, Ciszek and Cape Fear Neo's accountant, Lawrence Blake ("Blake"), conferred with each other, assessed the financial standing of the Practice, and then determined the gross amount to be divided equally among the physicians who were not in their initial three years of employment or absent from the Practice.[19]

10. According to Blake's unrebutted testimony, during the first five or six months of each year, Cape Fear Neo would use its gross income to pay its larger expenses, including taxes and contributions to the profit-sharing plan.[20] Around May or June and at the end of each subsequent month, Blake and Ciszek would review the amount of money the Practice had in its account, forecast the Medicaid payment schedule, and then determine whether there was enough surplus cash to pay out bonuses.[21] Blake and Ciszek typically left a reserve of $100,000 in the Practice's

[18] (*See* Gallaher Am. Emp. Cont. 2 (amending ¶ 10 of the original contract, and paginated as page 72); Cameron Emp. Cont. ¶ 10; Coggin Emp. Cont. ¶ 10.)

[19] (Pls.' Mot. Partial Summ. J. Ex. 61 Dep. Lawrence William Blake, dated June 10, 2021, at 19:22–20:14, 21:7–21 [hereinafter "Blake Dep."], ECF No. 69.62; Gallaher Aff. ¶¶ 14–15; Cameron Aff. ¶ 14; Coggin Aff. ¶¶ 12–13.) For ease of reference, Blake's deposition also appears as Exhibit 20 to Defendants' Index of Materials.

[20] (Blake Dep. 19:13–21, 23:4–8.)

[21] (Blake Dep. 19:22–20:5.)

account after bonus payments were made.[22] By 2017, Cape Fear Neo had calculated bonus payments this way for thirty-five years.[23] Cape Fear Neo paid bonuses every year until 2018, but those bonuses were never expressly guaranteed by the physicians' employment contracts.[24]

11. In or around 2016, Ciszek began discussing his retirement from Cape Fear Neo, but his intentions did not become widely known until late 2017 or early 2018.[25] On 8 June 2018, Plaintiffs, Ciszek, Blake, and an attorney hired by Cameron met to resolve the details of Ciszek's retirement from the Practice (the "June 2018 Meeting").[26] The exact events of the June 2018 Meeting are unclear, but the meeting became contentious and ended with Ciszek declaring that Plaintiffs were not shareholders of Cape Fear Neo, but instead mere employees, and that he could and would reduce their salaries to their respective original contract rates.[27]

---

[22] (Blake Dep. 20:5–6.)

[23] (Blake Dep. 22:5–10.)

[24] (*See* Salary and Bonus Chart; Gallaher Emp. Cont. ¶ 10(b); Gallaher Am. Emp. Cont. 2 (amending ¶ 10 of the original contract, and paginated as page 72); Cameron Emp. Cont. ¶ 10(b); Coggin Emp. Cont. ¶ 10(b).)

[25] (Cameron Aff. ¶ 19; Gallaher Dep. 19:01–25, 21:11–19; Pls.' Mot. Partial Summ J. Ex. 65 Dep. Kristen Boswell Coggin, M.D., dated Dec. 1, 2021, at 31:8–14 [hereinafter "Coggin Dep."], ECF No. 69.66; Gallaher Aff. ¶ 20.)

[26] (Blake Dep. 54:2–55:20; Gallaher Aff. ¶ 24; Coggin Aff. ¶¶ 19–20; Cameron Aff. ¶ 22.)

[27] (Blake Dep. 61:22–62:4; Gallaher Aff. ¶¶ 23, 25; Cameron Aff. ¶¶ 19, 21, 23; Coggin Aff. ¶¶ 17, 21.)

12. After the June 2018 Meeting, the work environment at Cape Fear Neo began to deteriorate.[28] Cameron and Coggin began pursuing employment with other medical providers.[29]

13. In or around September 2018 and acting pursuant to his duties as the Medical Director of the CFVMC neonatology department, Gallaher informed the Hospital's CEO, Michael Nagowski ("Nagowski"), that a number of Cape Fear Neo's physicians might be departing and that the Hospital's NICU could face possible staffing gaps as a result.[30] To avoid any lapses in NICU staffing, Nagowski began working with Plaintiffs to hire Coggin and Cameron as Hospital employees so the NICU would have continued coverage.[31]

14. Meanwhile, the Hospital Agreement between CCHS and Cape Fear Neo was set to renew on 1 May 2019.[32] On 21 December 2018, however, the Hospital sent a letter to Cape Fear Neo and Plaintiffs indicating that it would not renew its current contract with Cape Fear Neo, but would instead review the contract for "revision and modernization."[33]

---

[28] (*See* Blake Dep. 55:25–57:19.)

[29] (Cameron Dep. 28:12–29:16; Coggin Dep. 53:19–25.)

[30] (Gallaher Dep. 15:17–16:8, 16:21–18:12; Gallaher Aff. ¶¶ 30–31; Pls.' Mot. Partial Summ. J. Ex. 50 Gallaher's Resps. Defs.' First Set Interrogs. & Reqs. Produc. Docs. 6–7 [hereinafter "Gallaher Resp. Interrogs."], ECF No. 69.51.)

[31] (Gallaher Aff. ¶ 32.)

[32] (Ciszek Dep. 79:9–13; Hosp. Agreement 1.)

[33] (Pls.' Mot. Partial Summ. J. Ex. 31 [hereinafter "Hosp. Cont. Nonrenewal Notice"], ECF No. 69.32.)

15. On 25 January 2019, each Plaintiff executed an employment contract with the Hospital[34] and tendered a Notice of Termination of Contract to Cape Fear Neo later that day.[35] In their termination notices, Plaintiffs pledged to work through 30 April 2019 to comply with the ninety-day notice period in their employment contracts.[36]

16. The following week, on 31 January 2019, Gallaher, Coggin, and Cameron received their paychecks for the second half of January 2019. Instead of receiving their prevailing bi-monthly rate of pay—$12,600.00 (Gallaher), $10,725.00 (Cameron), and $9,433.33 (Coggin)—Plaintiffs were paid $3,958.34 (Gallaher), $8,333.34 (Cameron), and $8,333.34 (Coggin), amounts reflecting the salary rate each Plaintiff received when he or she was first hired by Cape Fear Neo.[37] Attached to each reduced paycheck was a twelve-word memo (the "Memo") that said, in its

---

[34] (Pls.' Mot. Partial Summ. J. Ex. 40 Physician Employment Agreement 1 [hereinafter "Gallaher Hosp. Emp. Cont."], ECF No. 69.42; Pls.' Mot. Partial Summ. J. Ex. 42 Physician Employment Agreement 1 [hereinafter "Cameron Hosp. Emp. Cont."], ECF No. 69.43; Pls.' Mot. Partial Summ. J. Ex. 44 Physician Employment Agreement 1 [hereinafter "Coggin Hosp. Emp. Cont."], ECF No. 69.45.)

[35] (Pls.' Mot. Partial Summ. J. Ex. 37 [hereinafter "Gallaher Termination Notice"], ECF No. 69.38; Pls.' Mot. Partial Summ. J. Ex. 38 [hereinafter "Cameron Termination Notice"], ECF No. 69.39; Pls.' Mot. Partial Summ. J. Ex. 39 [hereinafter "Coggin Termination Notice"], ECF No. 69.40.) For ease of reference, each of Plaintiffs' termination notices also appear as Exhibits 10–12 to Defendants' Index of Materials.

[36] (*See* Gallaher Termination Notice; Cameron Termination Notice; Coggin Termination Notice.)

[37] (Ciszek Dep. 83:12–85:12; Pls.' Mot. Partial Summ. J. Ex. 33 [hereinafter "Gallaher Paystubs"], ECF No. 69.34; Cameron Aff. ¶¶ 33–34; Pls.' Mot. Partial Summ. J. Ex. 35 [hereinafter "Coggin Paystubs"], ECF No. 69.36; Pls.' Mot. Partial Summ. J. Ex. 36 [hereinafter "Paystub Memo"], ECF No. 69.37.)

entirety: "Compensation has been adjusted to meet the terms of your employment agreement."[38] The Memo was the only written notice that any Plaintiff received about his or her reduced compensation.[39]

17. Also beginning that January, Cape Fear Neo stopped paying into the profit-sharing plan to which it had historically contributed on Plaintiffs' behalf.[40] Additionally, Cape Fear Neo did not pay a bonus to any physician of Cape Fear Neo, including Ciszek, in 2018 or 2019.[41]

18. Plaintiffs did not consent to the reduction of their salaries, the suspension of their profit-sharing contributions, or the withholding of their bonuses, but they nevertheless continued to work for Cape Fear Neo until 30 April 2019 to comply with the ninety-day notice provision in their employment contracts.[42] Plaintiffs believed that they had both a contractual and an ethical obligation to remain with Cape Fear Neo and care for the infants in the Hospital's NICU.[43]

---

[38] (Paystub Memo; *see* Ciszek Dep. 85:18–25.)

[39] (Gallaher Aff. ¶ 39; Cameron Aff. ¶ 33; Coggin Aff. ¶ 32.)

[40] (Gallaher Aff. ¶ 41; Cameron Aff. ¶ 35; Coggin Aff. ¶ 34.) The profit-sharing plan to which Cape Fear Neo contributed was essentially a retirement plan and was a component of the benefit package Plaintiffs received when they entered into their employment contracts with the Practice. (*See* Gallaher Aff. ¶ 10; Cameron Emp. Cont. ¶¶ 10, 17; Coggin Emp. Cont. ¶¶ 10, 17.)

[41] (Salary and Bonus Chart; Gallaher Aff. ¶¶ 34–35, 42; Cameron Aff. ¶¶ 29–30, 36; Coggin Aff. ¶¶ 29, 35.)

[42] (Gallaher Aff. ¶¶ 39–43; Cameron Aff. ¶¶ 33–37; Coggin Aff. ¶¶ 33–36.)

[43] (Gallaher Aff. ¶ 40; Cameron Aff. ¶ 34; Coggin Aff. ¶ 33.)

19.  Plaintiffs became Hospital employees on 1 May 2019 and are still employed by the Hospital.[44]  Cameron and Coggin work full-time, and Gallaher works part-time.[45]  Since 1 May 2019, neither Cape Fear Neo nor Ciszek has provided neonatology services to the Hospital.[46]

B.  Procedural History

20.  The Court recites only those portions of the procedural history that are relevant to its determination of the Motions.

21.  Plaintiffs filed the Complaint initiating this action on 24 September 2019.[47] In relevant part, the Complaint asserts claims against Cape Fear Neo and Ciszek for violations of the North Carolina Wage and Hour Act ("NCWHA") and against Cape Fear Neo for breach of contract.[48]  Plaintiffs additionally argue that the Court should pierce Cape Fear Neo's corporate veil and hold Ciszek personally liable on both claims.[49]

22.  On 16 December 2019, Defendants answered the Complaint and originally asserted several affirmative defenses and counterclaims.[50]  Defendants' affirmative

---

[44] (*See* Gallaher Hosp. Emp. Cont. 1; Cameron Hosp. Emp. Cont. 1; Coggin Hosp. Emp. Cont. 1; Gallaher Aff. ¶ 43; Cameron Aff. ¶ 37; Coggin Aff. ¶ 36.)

[45] (Gallaher Aff. ¶ 45; Cameron Aff. ¶ 39; Coggin Aff. ¶ 38.)

[46] (Ciszek Dep. 101:24–102:6.)

[47] (Compl., ECF No. 3.)

[48] (Compl. ¶¶ 48, 54.)

[49] (*See* Compl. ¶ 58.)

[50] (*See* Mot. Dismiss, Answer Compl. & Countercls. [hereinafter "Defs.' Answer & Countercls."], ECF No. 4.)

defenses included an allegation that Plaintiffs' claims are barred by the doctrine of judicial estoppel.[51] Defendants' counterclaims included claims for breach of contract, misappropriation of trade secrets, and wrongful interference with existing and prospective business relations.[52] On 14 February 2020, Defendants voluntarily dismissed their counterclaim for misappropriation of trade secrets.[53] On 16 October 2020, this Court granted Plaintiffs' motion to dismiss Defendants' counterclaim for wrongful interference with business relations. *See Gallaher v. Ciszek*, 2020 NCBC LEXIS 124, at *16–17 (N.C. Super. Ct. Oct. 16, 2020).

23. On 21 February 2022, Plaintiffs filed their Motion for Partial Summary Judgment.[54] Plaintiffs' Motion seeks the following relief: (1) the dismissal of Defendants' counterclaim for breach of contract; (2) entry of judgment on Plaintiffs' claim for breach of contract; (3) entry of judgment on Plaintiffs' claim for violation of the NCWHA; and (4) a determination that Defendant Ciszek is jointly and severally liable with Cape Fear Neo for Plaintiffs' damages through piercing the Practice's corporate veil.[55]

---

[51] (Defs.' Answer & Countercls. 8.)

[52] (Defs.' Answer & Countercls. 12–16.)

[53] (Voluntary Dismissal Without Prejudice, ECF No. 27.)

[54] (Pls.' Mot. Partial Summ. J. [hereinafter "Pls.' Mot. Summ. J."], ECF No. 69.)

[55] (Pls.' Mot. Summ. J. Prayer for Relief ¶¶ 1, 2, 11, 12.)

24. On 21 February 2022, Defendants filed their Motion for Summary Judgment, seeking summary judgment on Plaintiffs' and Defendants' remaining claims.[56]

25. The Motions were fully briefed, and the Court held a hearing on the Motions on 12 April 2022 (the "Hearing"), at which all parties were represented by counsel.

26. On 31 August 2022, the Court ordered supplemental briefing concerning whether Plaintiffs' claim(s) based on unpaid profit-sharing plan contributions were pre-empted by the federal Employment Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.*, and therefore must be dismissed.[57] In connection with that briefing, on 29 September 2022, Plaintiffs withdrew their affirmative claims for relief to the extent those claims were based on unpaid retirement plan contributions.[58]

27. The Motions are now ripe for determination.

## II.

## LEGAL STANDARD

28. Summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law." N.C. R. Civ. P. 56(c). An issue is genuine if it is

---

[56] (Defs.' Mot. Summ J. 1, ECF No. 73.)

[57] (Order Suppl. Br. Mots. Summ. J. ¶ 3, ECF No. 83.)

[58] (Pls.' Resp. Defs.' Suppl. Br. 3, ECF No. 88 ("Plaintiffs hereby withdraw any affirmative claim for relief, sounding in breach of contract or otherwise, based on unpaid Plan contributions.").)

"supported by substantial evidence," and "an issue is material if the facts alleged would constitute a legal defense, or would affect the result of the action, or if its resolution would prevent the party against whom it is resolved from prevailing in the action[.]" *DeWitt v. Eveready Battery Co.*, 355 N.C. 672, 681 (2002) (citation and quotation marks omitted). All of the "[e]vidence presented by the parties is viewed in the light most favorable to the non-movant." *Summey v. Barker*, 357 N.C. 492, 496 (2003).

29. The moving party "bears the initial burden of demonstrating the absence of a genuine issue of material fact." *Liberty Mut. Ins. Co. v. Pennington*, 356 N.C. 571, 579 (2002). "Once the party seeking summary judgment makes the required showing, the burden shifts to the nonmoving party to produce a forecast of evidence demonstrating specific facts, as opposed to allegations, showing that he can at least establish a *prima facie* case at trial." *Gaunt v. Pittaway*, 139 N.C. App. 778, 784–85 (2000). "The nonmoving party, in [its] response, 'must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.'" *Hopkins v. MWR Mgmt. Co.*, 2017 NCBC LEXIS 92, at *7 (N.C. Super. Ct. Oct. 3, 2017) (quoting N.C. R. Civ. P. 56(e)).

III.

ANALYSIS

A.    Cross-Motions on Plaintiffs' Claims for Breach of Contract and Violation of the North Carolina Wage and Hour Act

1. Breach of Contract Claim

30.    The Court first addresses the parties' cross-motions on Plaintiffs' claim that Cape Fear Neo breached Plaintiffs' individual employment contracts by unilaterally reducing Plaintiffs' wages and withholding bonuses.

31.    Under North Carolina law, a successful claim for breach of contract requires (1) a valid contract and (2) a breach of that contract's terms. *See Poor v. Hill*, 138 N.C. App. 19, 26 (2000). "A breach discharges further performance only if the breach was material." *Chesson v. Rives*, 2016 NCBC LEXIS 92, at *34 (N.C. Super. Ct. Nov. 30, 2016); *see also Crosby v. Bowers*, 87 N.C. App. 338, 345 (1987). "A material breach is 'one that substantially defeats the purpose of the agreement or goes to the very heart of the agreement, or can be characterized as a substantial failure to perform.' " *Chesson*, 2016 NCBC LEXIS 92, at *34 (quoting *Supplee v. Miller-Motte Bus. Coll., Inc.*, 239 N.C. App. 208, 220 (2015)). In other words, a term is material if it is such "an indispensable part of what both parties intended[,] . . . the contract would not have been made with the covenant omitted." *Wilson v. Wilson*, 261 N.C. 40, 43 (1964).

32.    "The provisions of a written contract may be modified or waived by a subsequent parol agreement, or by conduct which naturally and justly leads the other party to believe the provisions of the contract are modified or waived[.]" *Childress v. C.W. Myers Trading Post, Inc.*, 247 N.C. 150, 154 (1957); *see also Yamaha Int'l Corp.*

*v. Parks*, 72 N.C. App. 625, 628 (1985) ("Notwithstanding contract provisions to the contrary, . . . a written contract may be modified by a subsequent parol agreement, which may be either express or implied by the conduct of the parties."). "The critical elements are mutual assent to the modification, and consideration or a substitute supporting it." *Altman v. Munns*, 82 N.C App. 102, 105 (1986).

33.    Defendants concede that Plaintiffs had valid employment contracts with Cape Fear Neo that had been modified over the years, but Defendants deny that Cape Fear Neo has breached those contracts for various reasons discussed below.[59]

a.    *Cape Fear Neo's Failure to Pay Salaries*

34.    Both sides seek summary judgment on Plaintiffs' breach of contract claim premised on Cape Fear Neo's failure to pay Plaintiffs their wages as established by their modified employment contracts.

35.    Defendants contend that Cape Fear Neo's unilateral reduction of Plaintiffs' salaries was not a breach of Plaintiffs' employment contracts because Plaintiffs were at-will employees who acquiesced to the reduction by continuing to work at Cape Fear Neo after their salaries were reduced.[60]  Plaintiffs contend that they have rebutted the presumption of at-will employment and that Defendants' unilateral reduction of their salaries breached their contracts as a matter of law.[61]

---

[59] (Defs.' Br. Opp'n Pls.' Mot. Summ. J. 9–10 [hereinafter "Defs.' Br. Opp'n"], ECF No. 79.)

[60] (Apr. 12, 2022 Hr'g Tr. 74:1–20 [hereinafter "Tr."], ECF No. 90.)

[61] (*See* Resp. Br. Opp'n Defs.' Mot. Summ. J. 11–12 [hereinafter "Pls.' Br. Opp'n"], ECF No. 78.)

36. "North Carolina is an employment-at-will state[,]" *Young v. Bailey*, 368 N.C. 665, 668 (2016), and "both private and public employees may be classified as 'at-will' employees." *McCallum v. North Carolina Coop. Extension Serv. of N.C. State Univ.*, 142 N.C. App. 48, 56 (2001).

37. The employment at-will doctrine provides that "in the absence of a contractual agreement between an employer and an employee establishing a definite term of employment, the relationship is presumed to be terminable at the will of either party[.]" *Kurtzman v. Applied Analytical Indus., Inc.*, 347 N.C. 329, 331 (1997); *see also Wuchte v. McNeil*, 130 N.C. App. 738, 740 (1998) ("An employee is presumed to be an employee-at-will absent a definite term of employment or a condition that the employee can be fired only 'for cause.' "). Thus, "in the absence of an employment contract for a definite period, both employer and employee are generally free to terminate their association at any time and without any reason." *Salt v. Applied Analytical, Inc.*, 104 N.C. App. 652, 655 (1991).

38. The doctrine has limits, however, and a party can rebut the presumption of at-will employment in three ways:

> First, . . . parties can remove the at-will presumption by specifying a definite period of employment contractually. Second, federal and state statutes have created exceptions prohibiting employers from discharging employees based on impermissible considerations such as the employee's age, race, sex, religion, national origin, or disability, or in retaliation for filing certain claims against the employer. . . . Finally, this Court has recognized a public-policy exception to the employment-at-will rule.

*Kurtzman*, 347 N.C. at 331 (cleaned up).

39.     Plaintiffs contend that they have rebutted the presumption of at-will employment because their employment contracts provided for a definite term of one year.[62] It is undisputed, however, that each employment contract was terminable by either party at any time without cause and did not contain a definite termination date for the term of any Plaintiff's employment.  Instead, each contract stated that the term of employment would be for one year and would then continue, year by year, until terminated by either party with or without cause.[63]

40.     North Carolina law makes clear that contracts that do not specify a date for the end of an employee's employment, such as those here, are of indefinite duration. *See, e.g.*, *Ausley v. Bishop*, 133 N.C. App. 210, 219 (1999) ("[A]n employment contract where the compensation is specified at a rate per year, month, week or day, but where the duration of the contract is not specified, is for an indefinite period." (cleaned up)); *Wilkerson v. Carriage Park Dev. Corp.*, 130 N.C. App. 475, 477–78 (1998) ("Even where an employment contract specifies compensation at a yearly, monthly, weekly, or daily rate, this Court has held that if the term of service is not specified, the contract is for an indefinite period."); *Higgins v. Synergy Coverage Sols., LLC*, 2020 NCBC LEXIS 6, at *20 (N.C. Super. Ct. Jan. 15, 2020) (holding that employment until the sale of defendant company was for an indefinite term).

---

[62] (Pls.' Reply Defs.' Br. Opp'n 3, ECF No. 80.)  Plaintiffs do not offer argument or evidence to support either of the other two exceptions to the presumption of at-will employment, so the Court will confine its analysis to the first exception.

[63] (Gallaher Emp. Cont. ¶ 21; Coggin Emp. Cont. ¶ 24; Cameron Emp. Cont. ¶ 24.)

41. North Carolina law is likewise clear that an employment contract of indefinite or permanent duration creates at-will employment, even if, as here, compensation is set at a regular specified rate. *See, e.g.*, *Hogan v. Forsyth Cty. Club Co.*, 79 N.C. App. 483, 497 (1986) ("North Carolina adheres to the common law doctrine that employment contracts of indefinite duration are terminable at will."); *see also, e.g.*, *Wilkerson*, 130 N.C. App. at 477 (noting that "North Carolina law has consistently held that to remove an employer-employee relationship from the employment[-]at[-]will doctrine, the contract must specify a definite term of employment[ ]" and concluding that a performance-based bonus did not create a definite term); *Freeman v. Hardee's Food Sys., Inc.*, 3 N.C. App. 435, 438–39 (1969) (holding that an employment contract that set a yearly salary and provided for yearly pay adjustments, but which had no specified end date, created at-will employment). The Court therefore concludes that each Plaintiff's employment contract was terminable at-will as a matter of law.[64]

42. Having reached this conclusion, the Court must next consider whether Cape Fear Neo could unilaterally modify Plaintiffs' at-will employment contracts. Defendants argue that they could; Plaintiffs argue that they could not.[65]

---

[64] Indeed, Plaintiffs took advantage of the at-will nature of their employment when they tendered their resignations to Cape Fear Neo without cause. (*See* Gallaher Termination Notice (Gallaher's resignation "without cause"); Cameron Termination Notice (Cameron's resignation "without cause"); Coggin Termination Notice (Coggin's resignation "without cause.").)

[65] (*See* Tr. 21:24–22:4; 72:5–74:23.)

43.     "A contract, or 'any modification to an existing contract,' must be supported by consideration." *Addison Whitney, LLC v. Cashion*, 2017 NCBC LEXIS 23, at \*24 (N.C. Super. Ct. Mar. 15, 2017) (quoting *RoundPoint Mortg. Co. v. Florez*, 2016 NCBC LEXIS 18, at \*46 (N.C. Super. Ct. Feb. 18, 2016)). "An offer of employment 'may serve as consideration' when the employee makes a promise at the beginning of the employment relationship 'as a part of the initial employment terms.'" *Id.* at \*24 (quoting *RoundPoint Mortg.*, 2016 NCBC LEXIS 18, at \*47). However, "[i]f the agreement is entered into after the creation of the employment relationship, it must be supported by new consideration beyond the promise of continued at-will employment." *Id.* at \*24–25.[66]

44.     Here, there is no evidence that Cape Fear Neo provided any new consideration to Plaintiffs beyond their reduced salaries in exchange for Plaintiffs' pledge to work during the notice period.[67] As a result, the Court concludes that Cape Fear Neo's reduction in Plaintiffs' salaries without Plaintiffs' consent breached Plaintiffs' modified employment contracts as a matter of law.

---

[66] *RoundPoint Mortgage* relied upon the Supreme Court of North Carolina's holding in *Kadis v. Britt*, 224 N.C. 154, 161–63 (1944) (finding that consideration consisting of the continuance of at-will employment, which by its very nature may be taken away without cause, was illusory and cannot constitute consideration), but recognized that the North Carolina Court of Appeals appears to have held to the contrary forty years later in *Fraver v. N.C. Farm Bureau Mut. Ins. Co.*, 69 N.C. App. 733, 738 (1984) (holding that "[e]mployment contracts which are terminable at will may be modified at any time by either party with the continuance of the relationship serving as the consideration for the modification[ ]"). *See RoundPoint Mortg.*, 2016 NCBC LEXIS 18, at \*47–49 (noting that "[o]ther courts have also described consideration of the type discussed in *Kadis* as illusory and found that it cannot constitute consideration[,]" and citing *Henley Paper Co. v. McAllister*, 253 N.C. 529, 533 (1960) and *McLamb v. T.P. Inc.*, 173 N.C. App. 586, 591 (2005) for this proposition).

[67] (*See* Pls.' Br. Supp. 12–14; Defs.' Br. Supp. 4.)

45. But having found breach, the Court must next consider whether Plaintiffs waived that breach by continuing to work during the notice period, as Defendants contend.[68] Our Supreme Court has held that, under North Carolina law:

> a party may waive the breach of a contractual provision or condition without consideration or estoppel if[:] (1) [t]he waiving party is the innocent, or nonbreaching party, and (2) [t]he breach does not involve total repudiation of the contract so that the nonbreaching party continues to receive some of the bargained-for consideration . . . , and (3) [t]he innocent party is aware of the breach, and (4) [t]he innocent party intentionally waives his right to excuse or repudiate his own performance by continuing to perform or accept the partial performance of the breaching party.

*Wheeler v. Wheeler*, 299 N.C. 633, 639 (1980).

46. The Court considers each *Wheeler* element in turn to determine whether Plaintiffs waived their breach of contract claim.

47. First, it is undisputed that Plaintiffs did not breach their employment agreements. Even though Cape Fear Neo unilaterally reduced their salaries, the evidence shows that each Plaintiff completed working his or her ninety-day notice period.[69]

48. Second, there is no dispute that Plaintiffs received some of the bargained-for consideration under the modified contracts—i.e., salary payments at the original contract rate rather than no payments at all[70]—so the breach was not a total repudiation of each Plaintiffs' employment contract.

---

[68] (*See* Tr. 74:17–20.) Defendants advanced their waiver argument for the first time at the Hearing without objection from Plaintiffs.

[69] (Gallaher Aff. ¶ 40; Cameron Aff. ¶ 34; Coggin Aff. ¶ 33.)

[70] (Gallaher Aff. ¶¶ 39–40; Cameron Aff. ¶¶ 33–34; Coggin Aff. ¶¶ 32–33.)

49.     Third, the evidence establishes as a matter of law that Plaintiffs were aware of the breach because each Plaintiff has acknowledged receiving the Memo attached to the 31 January 2019 paychecks and thereafter accepted the reduced salary payments.[71]

50.     Fourth, there is no dispute that Plaintiffs continued to work for Cape Fear Neo after the Practice breached their employment contracts.[72]  Although Plaintiffs contend that they believed they were contractually obligated to work the remainder of their ninety-day notice periods and felt ethically responsible to continue caring for the infants in the NICU,[73] they knowingly accepted Cape Fear Neo's partial performance in the face of Cape Fear Neo's plain breach[74] when that material breach excused their further performance as a matter of law.

51.     Based on the above, the Court therefore concludes that Plaintiffs waived Defendants' reduced-salary-based breach of Plaintiffs' employment contracts as a matter of law.  As a result, the Court concludes that Defendants' motion for summary judgment on Plaintiffs' breach of contract claim based on reduced salary payments should be granted and Plaintiffs' claim dismissed with prejudice.

---

[71] (Gallaher Aff. ¶¶ 39–40; Cameron Aff. ¶¶ 33–34; Coggin Aff. ¶¶ 32–33.)

[72] (Gallaher Aff. ¶ 40; Cameron Aff. ¶ 34; Coggin Aff. ¶ 33.)

[73] (Gallaher Aff. ¶ 40; Cameron Aff. ¶ 34; Coggin Aff. ¶ 33.)

[74] (*See* Gallaher Paystubs; Cameron Aff. ¶ 34; Coggin Paystubs.)

### b. *Cape Fear Neo's Withholding of Bonus Payments*

52.   Defendants' Motion also seeks dismissal of Plaintiffs' claim that Defendants breached their contracts by not paying bonuses in 2018 or 2019.  Plaintiffs contend that shortly after May or June of each year, it was Cape Fear Neo's pattern and practice to pay out bonuses on a monthly basis until the end of the year, and Cape Fear Neo's failure to pay these bonuses in both 2018 and 2019 breached Plaintiffs' modified employment contracts.[75]

53.   Defendants, however, have correctly pointed out that despite Cape Fear Neo's alleged pattern and practice, bonuses were not automatically guaranteed, but instead depended upon prospective evaluations made by Blake and Ciszek and then were calculated as a proportion of the bonus paid to Ciszek.[76]  According to Blake's undisputed testimony, Cape Fear Neo would pay its larger expenses out of its gross income during the first five or six months of each year.[77]  Then, at the end of each month after May or June of a particular year, Blake and Ciszek would review the amount of money the practice had in its account, forecast the Medicaid payment schedule and any other debts that could come due, and then determine whether there was surplus cash that could be paid out as bonuses.[78]

---

[75] (*See* Pls.' Br. Opp'n 8–11.)

[76] (Defs.' Br. Supp. 12.)

[77] (Blake Dep. 19:13–21, 23:4–8.)

[78] (Blake Dep. 19:22–20:5.)

54. If any bonus was in fact paid, Gallaher's Contract provided that his bonus would be 11.11% of the bonus paid to Ciszek.[79] Gallaher's Contract was later amended to provide for a bonus calculated as equal in amount to the bonus received by Ciszek.[80] Coggin's and Cameron's Contracts provided that any bonuses paid to them would be calculated as fractions of the total "bonus pool" ranging from 1/12 to 3/15.[81] Therefore, the record evidence is undisputed that Gallaher's bonus depended on Ciszek receiving a bonus, while Coggin's and Cameron's bonuses depended on Cape Fear Neo generating a "bonus pool" to be split among the practitioners.

55. The question thus becomes whether Plaintiffs' employment contracts gave them a right to bonuses for the years in dispute. The Court concludes that they did not.

56. It is undisputed that neither Ciszek nor anyone else in the Practice received a bonus in 2018 or 2019.[82] Since Ciszek did not receive a bonus, Gallaher, by his own admission, was not entitled to a bonus under his employment contract.[83] Similarly,

---

[79] (Gallaher Emp. Cont. ¶ 10(b).)

[80] (Gallaher Am. Emp. Cont.) The amendments altered only the language that controlled bonuses. (*See* Gallaher Am. Emp. Cont. 3 (providing that"[e]xcept as amended [here], the [original] Employment Contract . . . shall remain in full force and effect[,]" and paginated as page 73).) The Court therefore refers to the original Gallaher Contract in its discussions of all issues other than the claims related to bonuses.

[81] (Coggin Emp. Cont. ¶ 10(b); Cameron Emp. Cont. ¶ 10(b).)

[82] (*See* Ciszek Dep. 76:18–22, 80:2–22 ("Q: [I]n 2018 I believe there were no bonuses that were paid out from the practice to *any of the practitioners*. Is that correct? A: That's probably correct if it doesn't say there were." (emphasis added)); Blake Dep. 39:23–40:1, 52:11–14, 79:25–80:2; Tr. 20:7–8, 83:2–4.)

[83] (Gallaher Dep. 53:5–18 ("Q: And, again, if Dr. Lowe and Dr. Ciszek didn't get any bonus, then you would not be entitled to any bonus either. Is that correct? A: Correct.").)

it is undisputed that Cape Fear Neo's total "bonus pool" in 2018 and 2019 was $0.[84] As a result, Coggin and Cameron acknowledge that they were not entitled to bonuses under their employment contracts for those years either.[85]

57. Nevertheless, Plaintiffs contend that they were entitled to bonuses in 2018 and 2019 because Defendants developed a pattern and practice of paying bonuses when Defendants had sufficient cash on hand.[86] Plaintiffs argue that, according to Cape Fear Neo's tax returns, the Practice had year-end cash assets in excess of $200,000 in 2018 and $400,000 in 2019.[87] Plaintiffs contend that Cape Fear Neo was therefore obligated to pay them bonuses according to the policy and practice it had adopted because it had the funds to do so.[88]

58. The record is undisputed, however, that even if Plaintiffs prevail in showing a pattern and practice of bonus payments, those bonuses were always paid in the exercise of Cape Fear Neo's discretion and the amount of any such bonus, when paid, was determined by Plaintiffs' respective employment contracts. Under those

---

[84] As noted above, the "bonus pool" is the contracts' short-hand for the salaries actually paid to certain named practitioners in excess of their collective standard salaries. (*See* Coggin Emp. Cont. ¶ 10(b); Cameron Emp. Cont. ¶ 10(b).) The Practice paid no bonus to any practitioner for the periods in dispute. (*See* Ciszek Dep. 76:18–22, 80:2–22.) Therefore, the "bonus pool" for these periods was $0.

[85] (Coggin Dep. 72:9–73:8 ("Q: So was it your understanding that if Dr. Ciszek didn't receive a bonus, that you didn't get a bonus? A: Yes."); Cameron Dep. 75:11–15 ("Q: [I]f you received under this agreement three-ninths of what Ciszek's [sic] and Gallaher and I guess Carter received, what's three-ninths of zero? A: Zero.").)

[86] (Pls.' Br. Opp'n 9–10.)

[87] (Pls.' Mot. Summ. J. Exs. 21–22, ECF Nos. 69.22–.23.)

[88] (Pls.' Br. Supp. 18–21.)

contracts, the amount Plaintiffs received was tied to the bonus amount Defendants elected to pay Ciszek and the funds they chose to make available for the "bonus pool" after Blake and Ciszek forecasted Cape Fear Neo's Medicaid payment schedule and other debts for the upcoming period.[89] Accordingly, because those amounts were each $0 in 2018 and 2019 after Blake and Ciszek conducted their review—a review that occurred both years[90]—Plaintiffs' claim for breach based on Cape Fear Neo's alleged pattern or practice of paying bonuses necessarily fails.

## 2. Violation of the North Carolina Wage and Hour Act Claim

59. Both parties seek summary judgment on Plaintiffs' claim that Cape Fear Neo violated the NCWHA by failing to pay Plaintiffs their full salaries from 31 January 2019 through 30 April 2019 and their earned bonuses for 2018 and 2019.

60. The NCWHA governs the state-level wage and hour requirements for North Carolina employers and the corresponding rights of covered employees. *See* N.C.G.S. § 95-25.1 *et seq.* Among other things, it includes requirements for minimum wages, overtime compensation, wage payment, and certain benefits. The statute covers all North Carolina employers and permits employees to file lawsuits to recover wages owed based on an employer's violation of the wage payment provisions. *See id.* § 95-25.22.

61. In construing the NCWHA or any other statute, "interpretation properly begins with an examination of the plain words of the statute." *Correll v. Div. of Soc.*

---

[89] (*See* Gallaher Am. Emp. 2 Cont. (paginated as page 72); Cameron Emp. Cont. ¶ 10(b); Coggin Emp. Cont. ¶ 10(b); Blake Dep. 21:7–23:25.)

[90] (Ciszek Dep. 79:24–80:22; Blake Dep. 52:11–14, 67:16–68:9, 79:15–82:6.)

*Servs.*, 332 N.C. 141, 144 (1992). "If the statutory language is clear and unambiguous, the court eschews statutory construction in favor of giving the words their plain and definite meaning." *State v. Beck*, 359 N.C. 611, 614 (2005). "Whatever may be the views and purposes of those who procure the enactment of a statute, the Legislature contemplates that its intention shall be ascertained from its words as embodied in it." *Abernethy v. Bd. of Comm'rs*, 169 N.C. 631, 640 (1915).

62.    The NCWHA defines "wages" to include "compensation for labor or services rendered by an employee whether determined on a time, task, piece, job, day, commission, or other basis of calculation, and . . . includes . . . bonuses[ ] and other amounts promised when the employer has a policy or a practice of making such payments." N.C.G.S. § 95-25.2(16). The statute requires that employers inform their employees in writing or in a posted notice at least one pay period before any decrease in promised wages takes effect. *See id.* § 95-25.13(3). The law prohibits employers from retroactively decreasing wages. *Id.*

63.    "[G]iving the statutory language its natural and ordinary meaning, the [NCWHA] requires" that

> [o]nce the employee has earned the wages and benefits . . . , the employer is prevented from rescinding them, with the exception that for certain benefits such as . . . bonuses . . . an employer can cause a loss or forfeiture of such pay if he has notified the employee of the conditions for loss or forfeiture in advance of the time when the pay is earned.

*Narron v. Hardee's Food Sys., Inc.*, 75 N.C. App. 579, 583 (1985), *overruled on other grounds by J & B Slurry Seal Co. v. Mid-South Aviation, Inc.*, 88 N.C. App. 1 (1987); *see also Moore v. Data Sys. Network Corp.*, No. COA00-1515, 2002 N.C. App. LEXIS

2107, at *20 (N.C. Ct. App. Aug. 20, 2002) (unpublished) ("An employer may change the wages and benefits offered at any time, so long as the employer notifies its employees, in writing or through a posted notice maintained in a place accessible to its employees, of such changes in promised wages prior to the time of such changes.")

a. *Cape Fear Neo's Failure to Pay Salaries*

64. Plaintiffs first contend that Cape Fear Neo violated the NCWHA by failing to pay Plaintiffs their full salaries from 1 January 2019 through 30 April 2019.[91] Plaintiffs' claim turns on whether the Memo that accompanied the 31 January 2019 paycheck to each Plaintiff satisfied the NCWHA's notice requirement for subsequent pay periods. Defendants contend that it did;[92] Plaintiffs argue that it did not.[93]

65. The parties nevertheless appear to agree, and the Court concludes based on the undisputed facts of record, that an NCWHA-qualifying notice did not precede Cape Fear Neo's 31 January 2019 reduced salary payments to Plaintiffs.[94] Cape Fear Neo's failure to tender this required notice plainly violated section 95-25.13(3). The Court therefore shall enter judgment for Plaintiffs against Cape Fear Neo under section 95-25.22(a) in the amount of the unpaid salary withheld by the Practice from

[91] (*See* Br. Supp. Pls.' Mot. Summ. J. 16–18 [hereinafter "Pls.' Br. Supp."), ECF No. 70.)

[92] (*See* Defs.' Br. Supp. Defs.' Mot. Summ. J. 11–12 [hereinafter "Defs.' Br. Supp."], ECF No. 74.)

[93] (*See* Pls.' Br. Supp. 16–18.)

[94] Defendants conceded this point at the Hearing. (*See* Tr. 58:5–8; *see also* Defs.' Br. Supp. 11–12.)

each Plaintiff's paycheck based on the Plaintiff's prevailing rate of pay on 31 January 2019, plus interest at the legal rate from the date that amount first came due.[95]

66.     The Court further concludes that Cape Fear Neo's January 31 notice, stating "Compensation has been adjusted to meet the terms of your employment agreement,"[96] when considered with Plaintiffs' contemporaneous receipt of the January 31 salary payments at the rates in their original employment agreements, put Plaintiffs on notice that each would receive salary payments thereafter consistent with those original agreements.  As a result, the Court concludes that the Memo provided the requisite notice under the NCWHA for all future salary payments and, therefore, the Court shall dismiss Plaintiffs' NCWHA claim with prejudice to the extent that it is based on reduced salary payments after 31 January 2019.

67.     Having determined that judgment should issue as to the January 31 payments, the Court next considers whether liquidated damages, costs, and attorneys' fees should be assessed against Cape Fear Neo under the NCWHA.

68.     The NCWHA provides that the court shall award liquidated damages in an amount equal to the "unpaid amounts due . . . plus interest at the legal rate set forth

---

[95] It is undisputed that the salary payments Plaintiffs received from Cape Fear Neo on 11 January 2019 and on 31 January 2019 were as follows: (i) Gallaher $12,600.00 (January 11); $3,958.34 (January 31), (*see* Gallaher Paystubs); (ii) Cameron $10,725.00 (January 11); $8,333.34 (January 31), (*see* Cameron Aff. ¶¶ 33–34); and (iii) Coggin $9,433.33 (January 11); $8,333.34 (January 31), (*see* Coggin Paystubs).  Judgment shall therefore be entered for each Plaintiff in the amount of the difference between these two payments as follows: Gallaher $8,641.66; Cameron $2,391.66; and Coggin $1,099.99, each plus interest at the legal rate from 31 January 2019.

[96] (Paystub Memo.)

in [N.C.]G.S. 24-1, from the date each amount first came due[,]"unless the employer carries its burden to show that its violations were "in good faith" and that it had "reasonable grounds for believing [that its actions were lawful]." N.C.G.S. § 95-25.22(a), (a1); *see, e.g.*, *Morris v. Scenera Research., LLC* (*Morris I*), 2012 NCBC LEXIS 29, at *14–15 (N.C. Super. Ct. May 14, 2012) ("Defendants bear the burden of proving their good faith and reasonable grounds for believing that their acts did not violate the [NCWHA]."), *rev'd on other grounds*, 229 N.C. App. 31 (2013), *rev'd in part*, 368 N.C. 857 (2016). "In the absence of such proof, the statute directs the court to grant damages in an amount equal to the unpaid wages owed. The issue of good faith is for the trial court's determination." *Morris I*, 2012 NCBC LEXIS 29, at *15.

69. In addition, under N.C.G.S. § 95-25.22(d), the trial court "may, in addition to any judgment awarded plaintiff, order costs and fees of the action and reasonable attorneys' fees to be paid by the defendant."

70. As to liquidated damages, the Court concludes that Defendants have failed to offer evidence from which a factfinder could conclude that that Cape Fear Neo's violations were in good faith and that it had reasonable grounds for believing that its actions were lawful. To the contrary, while the parties may have had a legitimate dispute over their respective contract rights under Plaintiffs' agreements with Cape Fear Neo, it is undisputed that Plaintiffs were Cape Fear Neo employees subject to the NCWHA and that absent conforming written notice, Cape Fear Neo had no legal right to reduce Plaintiffs' January 31 salary payments under the clear, unambiguous language of the NCWHA. Accordingly, the Court shall order Cape Fear Neo to pay

liquidated damages to Plaintiffs under section 95-25.22(a1) in the amount of the unpaid salary payments identified above.

71.  After careful deliberation, however, the Court declines to exercise its discretion to order Cape Fear Neo to pay the costs and fees of this action, including Plaintiffs' reasonable attorneys' fees under section 95-25.22(d).  Plaintiffs succeeded in establishing only one of the seven alleged NCWHA violations on which they sued, and the Court concludes, in the exercise of its discretion, that ordering Cape Fear Neo to pay Plaintiffs their fees and costs is neither reasonable, fair, nor in the interests of justice in the circumstances of this case.

b.  *Cape Fear Neo's Withholding of Bonus Payments*

72.  Defendants also seek to dismiss Plaintiffs' claim for failure to pay bonuses in 2018 and 2019, contending that Plaintiffs were not entitled to any bonuses during the disputed period.[97]  The Court agrees with Defendants.

73.  The NCWHA defines the term "wage" to include bonuses.  N.C.G.S. § 95-25.2(16).  As noted above, under N.C.G.S. § 95-25.13(3),

> [o]nce the employee has earned the wages and benefits under this statutory scheme, the employer is prevented from rescinding them, with the exception that for certain benefits such as commissions, bonuses and vacation pay, an employer can cause a loss or forfeiture of such pay if he has notified the employee of the conditions for loss or forfeiture in advance of the time when the pay is earned.

*Narron,* 75 N.C. App. at 583.  The statute therefore "permit[s] an employer to make changes in an employee's benefits, but the change applies only to those benefits accruing after written notice is given [to] the employee or notice is posted in a place

---

[97] (Defs.' Supp. 12–13.)

accessible to the employees." *Moses H. Cone Mem'l Health Servs. Corp. v. Triplett*, 167 N.C. App. 267, 273 (2004) (cleaned up). Although the NCWHA forbids reducing wages, including bonuses, without notice, "wage reduction" in this context has been interpreted to mean attempted withholding of an earned bonus, or a retroactive change to the formula by which an already earned bonus was calculated.[98]

74. The Court recognizes that the Supreme Court of North Carolina held that whether a bonus is "calculable" was a question of fact in *Morris v. Scenera Research, LLC* (*Morris III*), 368 N.C. 857, 862–63 (2016). However, there are critical distinctions between this case and *Morris*. There, the employee was indisputably entitled to $5,000 when the employer made a patent application, and another $5,000 if the patent issued. *Morris II*, 229 N.C. App. at 35. The employee argued that, because there were 150 patent applications pending when he left the employer, and his patent applications historically had a 90% success rate, he was entitled to $675,000, the amount he would receive if 90% of the 150 outstanding patents issued. *Morris III*, 368 N.C. at 863.

75. The Supreme Court held that whether the bonus was calculable was a question of fact that was properly submitted to the jury because the employee produced a formula based on a contractually guaranteed bonus for a specific sum, but the parties disagreed on whether that formula was properly applied. *Id.* at 863–64.

---

[98] *See, e.g.*, *Morris v. Scenera Research, LLC* (*Morris II*), 229 N.C. App. 31, 35, 40–42 (2013) (enforcing employee's right to earned bonus under the NCWHA), *rev'd on other grounds*, 368 N.C. 857 (2016); *Arndt v. First Union Nat'l Bank*, 170 N.C. App. 518, 520, 524–25 (2005) (same); *Triplett*, 167 N.C. App. at 272–73 (2004) (holding that the NCWHA did not protect an employee's bonus because the bonus had not accrued and was therefore not quantifiable).

Here, in contrast to *Morris* and to other cases that have found NCWHA violations based on the withholding of bonuses, there was no contractual bonus formula.[99] The payment of any bonus was within Ciszek's discretion and was not guaranteed.[100] As such, no bonus was capable of calculation. Neither Plaintiffs' contracts nor the pattern and practice they allege changes the discretionary nature of the bonus payments or requires that a bonus be made in a particular amount. In contrast to *Morris*, there is no factual dispute over the application of a particular proposed formula that a jury could properly resolve.

76. The Court therefore concludes that Plaintiffs were not entitled to receive bonuses in 2018 and 2019 under their contracts, and Ciszek's decision not to pay bonuses did not constitute an impermissible retroactive change to Plaintiffs' bonus rights within the meaning of the statute. As a result, Plaintiffs' NCWHA bonus claim must be dismissed.

B. Piercing the Corporate Veil

77. Both parties seek summary judgment on Plaintiffs' right to seek relief against Ciszek by piercing Cape Fear Neo's corporate veil. Plaintiffs contend that Ciszek completely dominated Cape Fear Neo and caused it to breach Plaintiffs' employment contracts which, they allege, is the direct cause of the harm they suffered.[101] Defendants argue instead that Plaintiffs' admissions regarding their

[99] *Cf. Morris II*, 229 N.C. App. at 35, 40–42; *Arndt*, 170 N.C. App. at 520, 524–25.

[100] (*See* Blake Dep. 21:22–22:2; Gallaher Dep. 53:5–18; Cameron Dep 75:11–15; Coggin Dep. 72:9–73:8.)

[101] (Pls.' Br. Opp'n 14–16.)

involvement in the operations of the Practice fatally undermine their claim that Ciszek exerted complete and total control over all actions taken by the Practice.[102]

78. "The general rule is that in the ordinary course of business, a corporation is treated as distinct from its shareholders." *Green v. Freeman*, 367 N.C. 136, 144–45 (2013) (quoting *State ex rel. Cooper v. Ridgeway Brands Mfg., LLC*, 362 N.C. 431, 438 (2008)).[103] "Disregarding the corporate form is not to be done lightly[ ] but is reserved only for an extreme case where necessary to serve the ends of justice[.]" *Kerry Bodenhamer Farms, LLC v. Nature's Pearl Corp.*, 2017 NCBC LEXIS 27, at \*12 (N.C. Super. Ct. Mar. 27, 2017) (cleaned up). Consequently, "[a] court's decision to pierce the corporate veil, thereby proceeding beyond the corporate form, is a strong step: Like lightning, it is rare and severe." *S. Shores Realty Servs. v. Miller*, 251 N.C. App. 571, 583 (2017) (cleaned up).

79. "It is well recognized that courts will . . . 'pierce the corporate veil' . . . whenever necessary to prevent fraud or to achieve equity." *Glenn v. Wagner*, 313 N.C. 450, 454 (1985). But it has also been observed that piercing the corporate veil "is among the most confusing [doctrines] in corporate law." Frank H. Easterbrook & Daniel R. Fischel, *Limited Liability and the Corporation*, 52 U. Chi. L. Rev. 89, 89 (1985). North Carolina has therefore adopted the "instrumentality rule" to guide

---

[102] (Defs.' Br. Supp. 14–17.)

[103] Under North Carolina law, professional corporations such as Cape Fear Neo are subject to the same "duties, restrictions, and liabilities" as other corporations. *See* N.C.G.S. § 55B-3. That Cape Fear Neo is a professional corporation, rather than a traditional corporation, does not affect the veil-piercing analysis.

courts in this "critical area of jurisprudence." *See Ridgeway Brands Mfg.,* 362 N.C. at 440. The rule applies if the corporation "had no separate role of its own," and a dominant shareholder exercised "actual control" to "operate[ ] the [corporation] as a mere instrumentality or tool." *Glenn*, 313 N.C. at 457. If the instrumentality rule applies, the "separate identities of parent and subsidiary or affiliated corporations may be disregarded." *Id.* at 453.

80. Furthermore, while *Glenn* dealt with piercing the corporate veil to hold a corporate parent liable, the same analysis applies when a plaintiff seeks to impose liability on a dominant shareholder. *See, e.g.*, *Ridgeway Brands Mfg.,* 362 N.C. at 440–43 (explaining that piercing doctrine predates *Glenn* and covers dominant shareholders, and applying the instrumentality rule to a dominant shareholder). Thus, when a corporation is operated as a mere alter ago of its dominant shareholder, "the corporate entity will be disregarded . . . whether the sole or dominant shareholder is an individual or another corporation." *Henderson v. Sec. Mortg. & Finance Co.*, 273 N.C. 253. 260 (1968).

81. Moreover, piercing the corporate veil is not a theory of liability. *See Green*, 367 N.C. at 146. "Rather, it provides an avenue to pursue legal claims against corporate officers or directors who would otherwise be shielded by the corporate form." *Id.* Control of a corporation alone is insufficient to pierce the veil. *See, e.g.*, *Waff Bros., Inc. v. Bank of N.C., N.A.*, 289 N.C. 198, 210 (1976) ("[t]he mere fact that all of the outstanding shares of stock of each of two corporations are owned by one individual, who is the chief executive officer of each corporation, does not necessarily

destroy the corporate entities so as to make the two corporations and the sole stockholder one and the same person in contemplation of the law."). Instead, the party that seeks to disregard the corporate form must also establish an independent claim on which to hold the controlling person or entity liable. *See, e.g., B-W Acceptance Corp. v. Spencer*, 268 N.C. 1, 8–9 (1966) (recognizing that where control exists "there must be additional circumstances showing fraud, actual or constructive, or agency[ ]" to hold a parent liable for its subsidiary's contracts) (citing *Whitehurst v. FCX Fruit & Vegetable Serv., Inc.*, 224 N.C. 628, 637 (1944)).

82. Under the instrumentality rule, a party must demonstrate three elements to pierce the corporate veil:

> (1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

> (2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and

> (3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Glenn*, 313 N.C. at 454–55.

83. *Glenn* also includes a list of nine factors courts may consider in determining whether the requisite control described in the first element exists: inadequate capitalization, non-compliance with corporate formalities, complete domination and control of the corporation, excessive fragmentation into multiple entities, non-

payment of dividends, insolvency of the corporation, siphoning of funds by the dominant shareholder, non-functioning of other officers or directors, and absence of corporate records. *Id.* at 455, 458. The *Glenn* court cautioned, however, that these factors were not exhaustive and that the presence or absence of any particular factor is not dispositive. *See id.* at 458.

84. Applying these factors here, the Court notes first that the evidence is undisputed that Ciszek was the sole shareholder, officer, and director of Cape Fear Neo at the time of the January 31 payments.[104] It is also undisputed that Ciszek had the sole authority to cause Cape Fear Neo to make salary payments to Plaintiffs,[105] and that Ciszek ordered Cape Fear Neo to make the reduced January 31 payments without proper notice to Plaintiffs under the NCWHA. Thus, with respect to this specific transaction, Ciszek acted for, and maintained complete domination and control over Cape Fear Neo. *See Glenn*, 313 N.C. at 455 (requiring the "complete domination . . . of policy and business practice *in respect to the transaction attacked* so that the corporate entity *as to this transaction* had at the time no separate mind, will or existence of its own[ ]" for veil piercing (emphasis added)). The Court thus concludes that the undisputed evidence shows that Ciszek used Cape Fear Neo as a mere instrumentality for purposes of this transaction.

---

[104] (Pls.' Mot. Summ. J. Ex. 60 Defs.' Resp. Pls.' First Req. Admis., 3–4 [hereinafter "Ciszek's Resp. RFA"], ECF No. 69.61.)

[105] (*See* Ciszek's Resp. RFA 3–4; Ciszek Dep. 83:20–85:25; Blake Dep. 44:1–20, 82:23–83:18.)

85.     Next, the undisputed evidence further shows both that Ciszek prepared the Memo accompanying the January 31 payment and instructed Blake to make the payment in the reduced amount,[106] and, as discussed above, the payment was made without proper notice in violation of the NCWHA.     The violation of a "statutory . . . duty" satisfies the second element of the *Glenn* test.  *Glenn*, 313 N.C. at 455; *see also Henderson*, 273 N.C. at 260 (permitting piercing when "the corporation is so operated . . . in violation of the declared public policy *or statute* of the State" (emphasis added)); *Becker v. Graber Builders, Inc.*, 149 N.C. App. 787, 791 (2002) (holding "viol[ation] [of] the North Carolina Building Code" sufficient to meet the wrongdoing prong of the instrumentality rule).  Ciszek's violation of the NCWHA therefore establishes the second element of the instrumentality rule.

86.     Finally, the evidence establishes as a matter of law that it was Ciszek's use of his domination and control that caused Cape Fear Neo to pay Plaintiffs the reduced January 31 payments[107] and proximately caused Plaintiffs to suffer the loss of salary that forms the basis for their NCWHA claims.

87.     Based on the above, therefore, the Court concludes that Plaintiffs have shown that they are entitled to pierce Cape Fear Neo's corporate veil as a matter of law to impose personal liability on Ciszek for Cape Fear Neo's violation of the NCWHA in making the reduced January 31 payments without proper notice.[108]

---

[106] (*See* Ciszek Dep. 83:20–85:25; Blake Dep. 44:1–20, 82:23–83:18.)

[107] (*See* Ciszek Dep. 83:20–85:25; Blake Dep. 44:1–20, 82:23–83:18.)

[108] Although alleging that both "Defendants" are liable on their NCWHA claim, (Compl. ¶¶ 48–50), Plaintiffs have not pleaded or argued any basis for Ciszek's individual liability under

88. In reaching this conclusion, the Court has considered but rejects Defendants' contention that Plaintiffs' January-31-based NCWHA claim should be barred by judicial estoppel.[109] Our Supreme Court has described judicial estoppel as follows:

> Broadly speaking, judicial estoppel prevents a party from acting in a way that is inconsistent with its earlier position before the court. This equitable doctrine, which may be invoked in a court's discretion, is inherently flexible and requires weighing of relevant factors. It is limited to assertions of fact in civil proceedings and does not require an intent to deceive the court, though such intent may nevertheless be a consideration supporting invocation of the doctrine. While many factors can affect a court's decision whether to invoke the doctrine, three frequently considered aspects of a case are whether: (1) the party's subsequent position is clearly inconsistent with its earlier position; (2) judicial acceptance of a party's position might threaten judicial integrity because a court has previously accepted that party's earlier inconsistent position; and (3) the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party as a result.

*Powell v. City of Newton*, 364 N.C. 562, 569 (2010) (cleaned up).

89. Defendants argue that judicial estoppel should apply because Plaintiffs alleged in an earlier, subsequently-dismissed action between the parties that Plaintiffs were shareholders who operated Cape Fear Nero "as an equal partnership with respect to corporate decision-making and division of corporate revenues[ ]"[110]

---

the NCWHA other than through piercing Cape Fear Neo's corporate veil. In particular, Plaintiffs have not pleaded or argued that Ciszek is directly liable under the NCWHA as an "employer" under the statute. *See* N.C.G.S. § 95-25.2(5) (defining "employer"); *Powell v. P2Enterprises, LLC*, 247 N.C. App. 731, 734 (2016) (applying "economic reality" test to determine individual liability under the NCWHA). Therefore, the Court does not consider Ciszek's individual liability under the NCWHA and instead resolves Ciszek's NCWHA liability for the January 31 payments solely based on its veil piercing analysis.

[109] (*See* Defs.' Br. Supp. 7–11.)

[110] (Defs.' Br. Opp'n 3 (quoting Index Materials Supp. Defs.' Supp. Ex. 15 Pet. Declaratory J. ¶ 28, ECF No. 75).)

and now inconsistently assert in this action that Ciszek "exercised total domination and control over the business and financial affairs of [the Practice.]"[111] While the Court recognizes that the allegations in the two lawsuits conflict, no party in this action disputes that Ciszek was the sole shareholder, officer, and director of the Practice in January 2019,[112] or that Ciszek caused the Practice to make reduced salary payments to Plaintiffs on 31 January 2019 in violation of the NCWHA.[113]

90. Accordingly, the Court declines to exercise its discretion to apply judicial estoppel. *See, e.g.*, *Whitacre P'ship v. BioSignia, Inc.*, 358 N.C. 1, 33 (2004) (stating that "judicial estoppel is to be applied in the sound discretion of our trial courts[ ]" and that "[i]f a trial court believes that justice would not be served by judicially estopping a party's factual contention, it may decline to do so[ ]") (quoting with approval *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 365 (3d Cir. 1996) ("[Judicial estoppel] is not meant to be a technical defense for litigants seeking to derail potentially meritorious claims, especially when the alleged inconsistency is insignificant at best and there is no evidence of intent to manipulate or mislead the courts.")).

---

[111] (Defs.' Br. Opp'n 4 (quoting Compl. ¶ 20).)

[112] (Ciszek's Resp. RFA 1–3.)

[113] (*See* Ciszek Dep. 83:20–85:25; Blake Dep. 44:1–20, 82:23–83:18.)

C. Cross-Motions on Defendants' Counterclaim for Breach of Contract

91. Both sides seek summary judgment on Defendants' counterclaim for breach of contract based upon Plaintiffs' alleged violations of Paragraphs 1, 2, 3, and the Non-Compete Clauses in their respective employment agreements.[114]

92. In a breach of contract action, "the complaint must allege the existence of a contract between plaintiff and defendant, the specific provisions breached, the facts constituting breach, and the amount of damages resulting to plaintiff from such breach." *Cantrell v. Woodhill Enters., Inc.*, 273 N.C. 490, 497 (1968) (emphasis omitted).

93. "When the language of the contract is clear and unambiguous, construction of the agreement is a matter of law for the court, and the court cannot look beyond the terms of the contract to determine the intentions of the parties." *Asheville Mall, Inc. v. F.W. Woolworth Co.*, 76 N.C. App. 130, 132 (1985) (cleaned up). "The contract is to be interpreted as written, and enforced as the parties have made it[.]" *State v. Philip Morris USA Inc.*, 363 N.C. 623, 632 (2009) (cleaned up). "Since the object of construction is to ascertain the intent of the parties, the contract must be considered as an entirety. The problem is not what the separate parts mean, but what the

---

[114] (*See* Pls.' Br. Supp. 26–42; Defs.' Br. Supp. 17–24.) Paragraphs 1, 2, and 3 of each Plaintiff's employment contract are almost identical. (*See* Gallaher Emp. Cont. ¶¶ 1–3; Cameron Emp. Cont. ¶¶ 1–3; Coggin Emp. Cont. ¶¶ 1–3.) The Non-Compete Clauses, however, appear at Paragraph 26 of the Cameron and Coggin Contracts, (*see* Cameron Emp. Cont. ¶ 26; Coggin Emp. Cont. ¶ 26), but at Paragraph 23 of the Gallaher Contract, (*see* Gallaher Emp. Cont. ¶ 23). The Court will reference these latter paragraphs collectively as the "Non-Compete Clauses." The Court also notes that Defendants did not seek to base their breach of contract counterclaim on Paragraphs 1 and 2 of the employment contracts until the Hearing. Plaintiffs responded to those newly made contentions during the Hearing, and the Court elects to consider them here.

contract means when considered as a whole." *Jones v. Casstevens,* 222 N.C. 411, 413–14 (1942) (citation omitted).

94.  The Court addresses each alleged contract breach in turn.

1. <u>Alleged Violations of Paragraph 1</u>

96.  Plaintiffs' employment contracts with Cape Fear Neo contained the following provision:

> Employer hereby employs Employee on the terms hereinafter provided on the understanding that *Employee will devote his[/her] utmost knowledge and best skill to the care of such patients as shall be entrusted to him[/her]* under general rules from time to time promulgated by Employer through its Board of Directors.[115]

97.  At the Hearing, Defendants contended that Plaintiffs failed to provide their "utmost knowledge and best skill to the care of [their] patients" because they sought employment with the Hospital while they were still employed by Cape Fear Neo.[116] The Court disagrees. Paragraph 1 of Plaintiffs' employment contracts is unambiguous, relates only to Plaintiffs' provision of medical care, and does not restrict Plaintiffs from seeking employment with future employers, including the Hospital. Because Defendants have not offered evidence suggesting that Plaintiffs failed at any time to devote their utmost knowledge and skill to the care of the patients at Cape Fear Neo, Defendants' counterclaim for breach of this paragraph necessarily fails and must be dismissed.

---

[115] (Coggin Emp. Cont. ¶ 1 (emphasis added); Cameron Emp. Cont. ¶ 1 (emphasis added).) Gallaher's Contract is slightly different, substituting "first party" for "Employer" and "second party" for "Employee." (*See* Gallaher Emp. Cont. ¶ 1.)

[116] (Tr. 32:20–33:22.)

### 2. Alleged Violations of Paragraph 3

98. Paragraph 3 of Plaintiffs' employment contracts with Cape Fear Neo states as follows:

> Employee hereby pledges his[/her] active and industrious practice of his[/her] profession in Employer's interest, his[/her] faithful adherence to the principles of ethics applicable to his[/her] profession, his[/her] compliance with those terms and conditions of the Independent Contractor Agreement between Cumberland County Hospital System, Inc. and Employer, . . . and his[/her] careful avoidance of all personal acts, habits and usages which might injure in any way, directly or indirectly, the professional or personal reputation of Employer or any person employed by it[.][117]

99. Defendants contend that Plaintiffs failed to uphold their pledge to engage in "active and industrious practice" in Cape Fear Neo's interest and instead pursued personal actions that injured Cape Fear Neo's professional reputation by negotiating future employment contracts with Nagowski and the Hospital.[118] Defendants argue that because the Hospital was Cape Fear Neo's only client, the Hospital's hiring of Plaintiffs eliminated the Hospital's need for Cape Fear Neo's neonatologists and thereby caused the Hospital not to renew its contract with the Practice. Defendants contend that this effectively put Cape Fear Neo out of business.[119] Based on this chain of events, Defendants contend that Plaintiffs violated Paragraph 3 of their employment contracts. The Court disagrees.

---

[117] (Gallaher Emp. Cont. ¶ 3; Coggin Emp. Cont. ¶ 3; Cameron Emp. Cont. ¶ 3.) Here again, Gallaher's Contract contains minor differences in terminology that do not affect the interpretation of this paragraph.

[118] (*See* Defs.' Br. Supp. 24.)

[119] (*See* Defs.' Br. Supp. 24.)

100. Like Paragraph 1, Paragraph 3 is unambiguous. The paragraph addresses Plaintiffs' commitment to provide competent, quality medical care and to act professionally and ethically as Cape Fear Neo employees. Defendants' contention that Paragraph 3 restricted Plaintiffs from entering contracts with the Hospital is found nowhere in its language and is contrary to the paragraph's plain meaning, particularly when the paragraph is considered as a whole. Indeed, only the last clause of Paragraph 3 even arguably has any connection to Defendants' counterclaims, but this clause appears in context with three other provisions that are clearly limited to job performance.[120] The doctrine of *noscitur a sociis*, "a rule of construction applicable to all written instruments[,]" *State v. Emery*, 224 N.C. 581, 583 (1944), in which "the meaning of a doubtful word may be ascertained by reference to the meaning of words with which it is associated[,]" *Gardner v. Reidsville*, 269 N.C. 581, 591 (1967), counsels the Court to read the last provision similarly. Because Defendants have failed to offer evidence from which a reasonable factfinder could conclude that the provisions of Paragraph 3 have been breached, the Court concludes that Defendants' counterclaim for breach of that paragraph must be dismissed.

---

[120] As noted above, Paragraph 3 of each contract contains four clauses, that the employee will: first, pledge his or her "active and industrious practice" of medicine in Cape Fear Neo's interest; second, adhere to medical ethics; third, comply with another agreement that deals with medical regulatory and licensure requirements; and fourth, avoid "all personal acts, habits, and usages" which might injure "the professional or personal reputation of [Cape Fear Neo] [.]" (Gallaher Emp. Cont. ¶ 3; Cameron Emp. Cont. ¶ 3; Coggin Emp. Cont. ¶ 3.)

### 3. Alleged Violations of Paragraph 2 and the Non-Compete Clauses

101. Defendants allege that Plaintiffs breached Paragraph 2 of their contracts by engaging in other gainful employment while they were employed at Cape Fear Neo.[121] They similarly allege that Plaintiffs breached the Non-Compete Clause in each employment contract "by soliciting employment from [the Hospital] during the term of their employment with [the Practice]."[122]

102. Paragraph 2 of each Plaintiffs' contract provides in relevant part as follows: "Employee agrees to devote to the employment his[/her] entire time and endeavor, and pledges himself[/herself] not to engage in any other gainful occupation during normal working hours without the prior consent of Employer's Board of Directors."[123]

103. Defendants contend that Plaintiffs breached this provision by communicating with Nagowski and "hammering out" contracts with the Hospital before their employment with Cape Fear Neo ended.[124] The undisputed evidence shows, however, that Plaintiffs did not begin to work or perform any services as

---

[121] Defendants abandoned their claim for breach of Paragraph 2 and the Non-Compete Clauses at the Hearing to the extent that it was based on Plaintiffs' conduct after their employment terminated on 30 April 2019. (Tr. 30:22–31:11.) *See, e.g.*, *Carter v. Clowers*, 102 N.C. App. 247, 250 (1991) ("A [defendant] is free to abandon an alleged or potential [counterclaim] against another party at any time."); *Danielson v. Cummings*, 300 N.C. 175, 179 (1980) (upholding a voluntary dismissal under Rule 41 based on the "very strong tradition in this State equating oral notice in open court with written notice filed with the clerk[ ]").

[122] (Defs.' Br. Supp. 21.)

[123] (Gallaher Emp. Cont. ¶ 2; Coggin Emp. Cont. ¶ 2; Cameron Emp. Cont. ¶ 2.) Here again, Gallaher's Contract contains minor differences in terminology that do not affect the interpretation of this paragraph.

[124] (Defs.' Br. Supp. 22–23.)

Hospital employees until their employment with Cape Fear Neo ended on 30 April 2019.[125] As a result, Defendants have failed to offer evidence from which a reasonable factfinder could conclude that any Plaintiff breached Paragraph 2 of his or her contract prior to 30 April 2019, and Defendants' counterclaim based on this alleged conduct must therefore be dismissed.

104. Defendants' counterclaim for alleged breach of the Non-Compete Clauses fares no better. Gallaher's non-compete provided as follows:

> [Employee] hereby agrees that during the term of this Agreement and for a period of one (1) year after the termination of his employment with [Employer], he will not engage in the practice of neonatology, nor be an officer, director, shareholder or employee of a corporation, nor an owner, investor or employee of any other business in competition with the business of [Employer] in Cumberland County, North Carolina, or any other county within the geographical area under the supervision and control of the Cardinal Health Agency as of the date of this Agreement.[126]

105. Coggin's and Cameron's non-competes are identical and very similar to Gallaher's:

> Employee hereby agrees that during the term of this Employment Contract and for a period of one (1) year after the termination of his[/her] employment with Employer, he[/she] will not engage in the practice of neonatology, nor be an officer, director, shareholder, member, partner, other type of owner or employee of a corporation, limited liability company or partnership, nor an owner, investor or employee of any other business in competition with the business of Employer in Cumberland County, North Carolina . . . or any other counties within the current or potential geographical service area of [Employer] as of the date of this Employment Contract.[127]

---

[125] (*See* Gallaher Hosp. Emp. Cont. 1; Cameron Hosp. Emp. Cont. 1; Coggin Hosp. Emp. Cont. 1; Gallaher Aff. ¶ 43; Cameron Aff. ¶ 37; Coggin Aff. ¶ 36; Tr. 36:7–18.)

[126] (Gallaher Emp. Cont. ¶ 23.)

[127] (Coggin Emp. Cont. ¶ 26; Cameron Emp. Cont. ¶ 26.)

106. Defendants argue that Plaintiffs breached these provisions by discussing employment and signing contracts with the Hospital while they were still working for Cape Fear Neo.[128] Again, the Court disagrees.

107. Defendants offer no evidence that Plaintiffs engaged in the practice of neonatology with any other organization in competition with Cape Fear Neo or began working as an employee of the Hospital until after their employment with Cape Fear Neo had concluded. The fact that Plaintiffs initiated communications and signed contracts with the Hospital concerning their *future* employment does not violate the plain terms of any Plaintiff's Non-Compete Clause.

108. Moreover, contrary to Defendants' contention, the fact that Plaintiffs' decision to initiate discussions and sign contracts with the Hospital may have been a factor in the Hospital's independent decision not to renew Cape Fear Neo's contract with the Hospital is not evidence that any of the Plaintiffs engaged in the practice of neonatology, began working for the Hospital prior to 30 April 2019, or engaged in competition against Cape Fear Neo in violation of their non-compete agreements.

109. Based on the above, the Court concludes that Defendants' counterclaim for breach of Plaintiffs' Non-Compete agreements necessarily fails and must therefore be dismissed.

---

[128] (*See* Defs.' Br. Supp. 17–21.)

## IV.
## CONCLUSION

110. **WHEREFORE**, the Court, for the foregoing reasons, hereby **ORDERS** as follows:

a. Plaintiffs' Motion for Partial Summary Judgment is **GRANTED** and Defendants' Motion for Summary Judgment is **DENIED** as to (i) Plaintiffs' claim for violation of the NCWHA to the extent that it is based on Cape Fear Neo's 31 January 2019 salary payments to Plaintiffs and as to piercing Cape Fear Neo's corporate veil to impose liability on Ciszek for Cape Fear Neo's NCWHA violation; and (ii) Defendants' counterclaim for breach of contract; therefore:

(1) **JUDGMENT IS HEREBY ENTERED** against Cape Fear Neo for violation of the NCWHA, and Plaintiffs shall have and recover from Cape Fear Neo for such violation, including liquidated damages, as follows:

(a) Gallaher $17,283.32;

(b) Cameron $4,783.32;

(c) Coggin $2,199.98;

plus interest at the legal rate from 31 January 2019 until the judgment is satisfied;

(2) **JUDGMENT IS HEREBY ENTERED** against Ciszek for Cape Fear Neo's liability for violating the NCWHA and therefore

Ciszek shall be liable, jointly and severally, with Cape Fear Neo for the judgment entered herein against Cape Fear Neo; and

(3) Defendants' counterclaim for breach of contract is hereby **DISMISSED** with prejudice.

b. Defendants' Motion for Summary Judgment is **GRANTED** and Plaintiffs' Motion for Partial Summary Judgment is **DENIED** as to Plaintiffs' claims for breach of contract and for violation of the NCWHA to the extent that those claims are based on Defendants' alleged failure to pay Plaintiffs' salaries after 31 January 2019 and to pay Plaintiffs bonuses; therefore:

(1) Plaintiffs' claim for breach of contract based on Defendants' alleged failure to pay Plaintiffs' salaries after 31 January 2019 is hereby **DISMISSED** with prejudice;

(2) Plaintiffs' claim for breach of contract based on Defendants' alleged failure to pay Plaintiffs bonuses in 2018 and 2019 is hereby **DISMISSED** with prejudice;

(3) Plaintiffs' claim for violation of the NCWHA based on Defendants' alleged failure to pay Plaintiffs' salaries after 31 January 2019 is hereby **DISMISSED** with prejudice; and

(4) Plaintiffs' claim for violation of the NCWHA based on Defendants' alleged failure to pay bonuses in 2018 and 2019 is hereby **DISMISSED** with prejudice.

c. Having now adjudicated all remaining claims in this action through summary judgment, the Court enters this Order and Opinion as its **FINAL JUDGMENT** in this action.

**SO ORDERED**, this the 4th day of November, 2022.

/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Chief Business Court Judge